**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOISEASTERN DIVISION**

| | | |
|---|---|---|
| SANDRA TRIO, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | No. 1:21-cv-04409 |
| Plaintiff, | ) | |
| | ) | Honorable John Robert Blakey |
| v. | ) | |
| | ) | |
| TURING VIDEO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**TURING VIDEO'S MEMORANDUM OF LAW IN SUPPORT OF
ITS AMENDED MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Melissa A. Siebert (masiebert@shb.com)
Erin Bolan Hines (ehines@shb.com)
Ambria D. Mahomes (amahomes@shb.com)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel:  (312) 704-7700
Fax:  (312) 558-1195

*Attorneys for Defendant Turing Video*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

LEGAL STANDARD .............................................................................................. 4

ARGUMENT ......................................................................................................... 5

I.     The Complaint Should Be Dismissed Under Rule 12(b)(2) For Lack Of PersonalJurisdiction ........................................................................... 5

     A.    Lack of General Jurisdiction ..................................................... 5

     B.    Lack of Specific Jurisdiction ..................................................... 5

II.    The Complaint Should Be Dismissed Under Rule 12(b)(1) Because Plaintiff's Claims Are Preempted By Section 301 of the LMRA .......................... 8

     A.    Plaintiff's claims require interpretation of the CBA's management rights clause ....................................................... 9

     B.    The LMRA Preempts Plaintiff's BIPA Claims Even Though Turing Is Not A Signatory To The CBA ................................... 12

III.   The Complaint Should Be Dismissed Under Rule 12(b)(6) For Failure To State AClaim For Which Relief Can Be Granted ................................. 13

     A.    Plaintiff's Claims Are Barred by Illinois' Extraterritoriality Doctrine ............................................................................ 13

     B.    Plaintiff Has Failed to Plead that Turing Collected, Captured, or PossessedAny Biometric Information or Data ........................... 15

     C.    Plaintiff's Claims Are Preempted by the PREP Act .................. 16

CONCLUSION ...................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Allis-Chalmers Corp. v. Lueck,*
    471 U.S. 202 (1985)......................................................................................................12

*Apex Digital, Inc. v. Sears, Roebuck & Co.,*
    572 F.3d 440 (7th Cir. 2009) ...................................................................................4

*Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.,*
    244 F. Supp. 3d 750 (N.D. Ill. 2017) ....................................................................13

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................................4

*Bray v. Lathem Time Co.,*
    No. 19-3157, 2020 WL 1492742 (C.D. Ill. Mar. 27, 2020)................................7, 8

*Brown v. Keystone Consol. Indus., Inc.,*
    680 F. Supp. 1212 (N.D. Ill. 1988) .......................................................................12

*Christopher (Rosemary T.), Est. of Christopher (Nick) v. Midwest Express
    Airlines, Inc.,*
    No. 86 C 1750, 1986 WL 8756 (N.D. Ill. Aug. 4, 1986)........................................8

*Crooms v. Sw. Airlines Co.,*
    459 F. Supp. 3d 1041 (N.D. Ill. 2020) ..................................................................11

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014).................................................................................................5

*Fernandez v. Kerry, Inc.,*
    14 F.4th 644 (7th Cir. 2021) ......................................................................9, 10, 11

*Golden v. Kelsey-Hayes Co.,*
    878 F. Supp. 1054 (E.D. Mich. 1995).....................................................................12

*Gullen v. Facebook.com, Inc.,*
    No. 15 C 7681, 2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ...................................7

*Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.,*
    977 F.2d 895 (4th Cir. 1992) .................................................................................12

*Interlease Aviation Inv'rs II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,*
    262 F. Supp. 2d 898 (N.D. Ill. 2003)......................................................................4

*Janus v. AFSCME, Council 31*,
    138 S. Ct. 2448 (2018) ........................................................................................11

*Kimbro v. Pepsico, Inc.*,
    215 F.3d 723 (7th Cir. 2000) ............................................................................12

*Lingle v. Norge Div. of Magic Chef, Inc.*,
    486 U.S. 399 (1988) ............................................................................................8

*Matter of Amoco Petroleum Additives Co.*,
    964 F.2d 706 (7th Cir. 1992) ............................................................................10

*McGoveran, v. Amazon Web Servs., Inc. & Pindrop Security, Inc.*,
    No. CV 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) ............... *passim*

*McGoveran v. Amazon Web Servs., Inc.*,
    488 F. Supp. 3d 714 (S.D. Ill. 2020) .................................................................8

*Miller v. Southwest Airlines Co.*,
    926 F.3d 898 (7th Cir. 2019) .....................................................................4, 9, 11

*Monroy v. Shutterfly, Inc.*,
    No. 16 C 10984, 2017 WL 4099846 (N.D. Ill. Sept. 15, 2017) .......................15

*Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL–CIO of Wash. D.C.*,
    214 F. Supp. 2d 655 (E.D. Va. 2002) ...............................................................12

*Neals v. PAR Tech. Corp.*,
    419 F. Supp. 3d 1088, 1090-91 (N.D. Ill. 2019) ..............................................13

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ..............................................................................5

*Roiser v. Cascasde Mountain, Inc.*,
    367 Ill.App.3d 559, 855 N.E.2d 243 (2006) ......................................................8

*Salkauskaite v. Sephora USA, Inc.*,
    No. 18-CV-08507, 2020 WL 2796122 (N.D. Ill. May 30, 2020) ................... *passim*

*Stein v. Clarifai, Inc.*,
    No. 20 C 1937, 2021 WL 1020997 (N.D. Ill. Mar. 16, 2021) ........................6, 7

*Stringer v. Nat'l Football League*,
    474 F. Supp. 2d 894 (S.D. Ohio 2007) .............................................................12

*Tamburo v. Dworkin*,
    601 F.3d 693 (7th Cir. 2010) ..............................................................................5

*Taylor v. McCament*,
    875 F.3d 849 (7th Cir. 2017) ....................................................4

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ....................................................2

*Wiedemann v. Cunard Line Ltd.*,
    63 Ill.App.3d 1024 (1st Dist. 1978) ....................................8

**Statutes**

740 ILCS 14/10 ....................................................15, 16

740 ILCS 14/15 ....................................................15

21 U.S.C. § 321(h) ....................................................18

Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d *et seq.* ......16, 17, 18, 19

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................................................4, 8

Federal Rule of Civil Procedure 12(b)(2) ....................................................5

Federal Rule of Civil Procedure 12(b)(6) ....................................................4, 13

**Other Authorities**

21 C.F.R. § 884.2980(a) ....................................................18, 19

Declaration Under the Public Readiness and Emergency Preparedness Act for
    Medical Countermeasures Against COVID-19, § V, 85 Fed. Reg. 15,198, 15,
    201-02 (Mar. 17, 2020) ....................................................17, 18

*Enforcement Policy for Telethermographic Systems During the Coronavirus*
    *Disease 2019 (COVID-19) Public Health Emergency: Guidance for Industry*
    *and Food and Drug Administration Staff (April 2020)*, U.S. DEPARTMENT
    OF HEALTH AND HUMAN SERVICES FOOD AND DRUG
    ADMINISTRATION CENTER FOR DEVICES AND RADIOLOGICAL
    HEALTH, OFFICE OF PRODUCT EVALUATION AND QUALITY, at 4,
    available at https://www.fda.gov/media/137079/download ....................................................19

*Thermal Imaging Systems (Infrared Thermographic Systems / Thermal Imaging*
    *Cameras*, U.S. FOOD & DRUG ADMINISTRATION, available at:
    https://www.fda.gov/medical-devices/general-hospital- devices-and-
    supplies/thermal-imaging-systems-infrared-thermographic-systems-thermal-
    imaging- cameras ....................................................18

iv

U.S. Department of Health and Human Services ("HHS"), Determination that a
Public Health Emergency Exists (Jan. 31, 2020),
https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-
nCoV.aspx..................................................................................................................17

## **INTRODUCTION**

Plaintiff Sandra Trio brings this lawsuit claiming that Turing Video ("Turing" or the "Company") violated the Illinois Biometric Information Privacy Act ("BIPA") by providing thermal scan technology designed to thwart the effects of the coronavirus ("COVID-19") pandemic. In her Complaint, Plaintiff acknowledges that Turing provides "security and health solutions to companies across an array of industries," and that it provided services "[i]n an effort to help businesses comply with COVID-19 regulations and help safeguard their employees and customers." Unfortunately, her interest in litigation trumped the need for COVID-19 safety measures. She claims that Turing's COVID-19 response kiosk, the Turing Shield, somehow collects an individual's facial geometry, stores it, and disseminates it. Plaintiff's Complaint fails to state a claim against Turing and should be dismissed for four separate reasons.

First, this Court lacks personal jurisdiction. Turing is a Delaware corporation with its principal place of business in California. The Company contracts with entities across the country to provide artificial intelligence technology. It has no control over where its systems are used nor where its customers' employees who ultimately utilize the technology reside. The Court, therefore, lacks jurisdiction given that the Complaint fails to allege and cannot prove that Turing's actions were purposely directed toward Illinois.

Second, Plaintiff's claims are preempted under the Labor Management Relations Act ("LMRA"). While employed at Jewel-Osco Plaintiff was a member of a union. Resolution of her claims requires interpretation of provisions in her union's collective bargaining agreement ("CBA") that address management rights, grievance and arbitration.

Third, Plaintiff's attempt to regulate Turing, a company which operates primarily and substantially outside Illinois, seeks impermissible, extraterritorial application of BIPA. As

discussed above, Turing is a Delaware company based in California. To apply BIPA principles to a company with insufficient connections to Illinois would be unjustifiable.

Fourth, Plaintiff's claims are expressly exempted under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. 247d-6d (the "PREP Act"). Turing's thermal scan kiosk was manufactured as a countermeasure to the COVID-19 health emergency, and therefore, it is immune from liability for any of Plaintiff's claims.

## **FACTUAL BACKGROUND**

Turing manufactures a number of safety, security, and health devices across a number of industries. *Turing*, https://turingvideo.com/ (last visited Oct. 12, 2021) (hereinafter "Turing Website").[1] The Company prides itself on developing complex, machine learning models to integrate with industry-proven robotics, video analytics, and health solutions to create interconnected AI-enabled solutions unlike any other in the world. It is best known for its safety and security video surveillance platform. *Id.* In recent times, Turing's technology has come into use combatting COVID-19. *Id.* Particularly, Turing's thermal device, the Turing Shield, has been at the forefront of pandemic-relief technology initiatives. *Id.*

The Turing Shield was developed in 2020. Ex. 1, Declaration of Xing Zhong, ¶ 5. It is a workplace kiosk system that provides employers with the ability to monitor, report, alert, remediate, detect fever, ensure mask compliance, and contact trace. *Id.* It first asks that a user fill out a health questionnaire drafted by the Center for Disease Control and Prevention ("CDC"). *Id.*

---

[1] Plaintiff's Complaint references and relies on portions of Turing's publically available website (¶¶ 6, 8), but does not provide complete versions of the website, thus making it appropriate for reference here. The Court may consider these documents as part of Plaintiff's pleading because they are "referred to in Plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also McGoveran, v. Amazon Web Servs., Inc. & Pindrop Security, Inc.,* No. CV 20-1399-LPS, 2021 WL 4502089, at *4 n.3 (D. Del. Sept. 30, 2021) (permitting citation to a website in support of motion to dismiss BIPA class action).

at ¶ 7; Compl. ¶ 4. Next, upon completion of the questionnaire, it provides a QR code to be scanned into the device by the user if requested by the customer. *Id*. at ¶ 8; Compl. ¶ 4. After completion of the questionnaire or scanning the QR code, the individual's body temperature is taken and a determination as to whether the individual is wearing a mask takes place. *Id*. at ¶ 9; Compl. ¶ 5. If all requirements are met (a low enough body temperature and the presence of a mask), a badge is printed that states, "Pass." *Id*. at ¶ 10. The device is designed to mitigate, prevent, and limit further harm that may be caused by the COVID-19 pandemic. *Id.*; Compl. ¶ 2; Turing Website.

Albertsons is one of Turing's customers. Ex. 1 at ¶ 12; Turing Website. The two entities have a contractual relationship whereby Turing sells Turing Shield kiosks to Albertsons so that Albertsons may mitigate the risk of the spread of COVID-19 infections at the grocery stores it owns. *Id.*; Compl. ¶¶ 2-8, 54. Turing does not have a contractual relationship with Jewel-Osco. Plaintiff alleges she worked for New Albertson's Inc. d/b/a Jewel-Osco. Compl. ¶ 53. Upon arrival at the workplace, Jewel-Osco employees are required to check-in through the kiosk to ensure that they: (1) do not have a high temperature; and (2) are wearing a mask. *Id*. ¶ 5. Her employment at Jewel-Osco and use of the Turing Shield gave rise to her claims in this lawsuit.

As an employee at Jewel-Osco, Plaintiff was a member of the United Food and Commercial Workers' International Union, Local 881 ("Union") that entered into a CBA with her employer, Jewel Food Stores, Inc. (Ex. 2, ¶ 5). The CBA made the Union Plaintiff's sole agent for purposes of collective bargaining, granted Jewel-Osco broad management rights, and set forth a grievance procedure that required disputes regarding the CBA to be handled in arbitration. *Id.* at Ex. A, Sections 1.1, 8.11, 9.2, 9.3.

On July 2, 2021, Plaintiff filed suit in Cook County Circuit Court alleging violations of: (1) BIPA Section 15(b) for failure to obtain informed written consent and a release before

obtaining biometric identifiers or information; and (2) BIPA Section 15(d) for disclosure of biometric identifiers and information before obtaining consent. *See* Compl. ¶¶ 78- 96.

## LEGAL STANDARD

When a defendant seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff "bears the burden of demonstrating the existence of jurisdiction." *Salkauskaite v. Sephora USA, Inc.*, No. 18-CV-08507, 2020 WL 2796122, at \*3 (N.D. Ill. May 30, 2020). The Court may consider jurisdictional affidavits and must "accept[] as true any facts contained in the defendant['s] affidavit[] that remain unrefuted by the plaintiffs." *Interlease Aviation Inv'rs II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* 262 F. Supp. 2d 898, 905 (N.D. Ill. 2003*); see also Salkauskaite*, 2020 WL 2796122, at \*3.

A dismissal based on labor law preemption should be labeled as a judgment on the pleadings under Fed. R. Civ. P. 12(c), or a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Miller v. Southwest Airlines Co.,* 926 F.3d 898, 901 (7th Cir. 2019) (declining to determine which label was more appropriate because "either a substantive or jurisdictional label ends the litigation between these parties and forecloses its continuation in any other judicial forum"). In addition, where "external facts call the court's jurisdiction into question," courts "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017); *Apex Digital, Inc. v. Sears, Roebuck & Co*., 572 F.3d 440, 443-44 (7th Cir. 2009).

A court may also dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim if the plaintiff fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The federal pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "more than labels and conclusions." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Mere legal conclusions are not "facts." *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Unless the complaint pleads sufficient facts to cross the line "from conceivable to plausible," it must be dismissed. *Twombly*, 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Iqbal*, 556 U.S. at 678.

## **ARGUMENT**

### I. **The Complaint Should Be Dismissed Under Rule 12(b)(2) For Lack Of Personal Jurisdiction**

#### A. **Lack of General Jurisdiction**

To establish general jurisdiction, Plaintiff must show that Turing is incorporated or has its principal place of business in Illinois. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). She has done neither, nor can she because as her Complaint acknowledges, Turing is incorporated in Delaware with its principal place of business located in San Mateo, California. (Compl. ¶ 25) Absent these basic requirements, general jurisdiction in Illinois would only exist in the exceptional case, which this is not. *See Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) ("The threshold for general jurisdiction is high . . . isolated or sporadic contacts . . . are insufficient").

#### B. **Lack of Specific Jurisdiction**

The Court lacks specific jurisdiction because Plaintiff fails to establish that Turing "purposely directed" its business activities at Illinois, as opposed to merely selling Turing Shield kiosks to companies seeking to mitigate the risk of spreading COVID-19. *Salkauskaite*, No. 18-CV-08507, 2020 WL 2796122, at *4 (finding no personal jurisdiction over company selling "augmented-reality ("AR") products to beauty brand companies"); *see also Stein v. Clarifai, Inc.*,

No. 20 C 1937, 2021 WL 1020997, at **2-5 (N.D. Ill. Mar. 16, 2021) (finding no personal jurisdiction over company offering a "globally accessible" service). Plaintiff alleges that she is an Illinois domiciliary. Compl. ¶ 24. Even if true, and if Plaintiff could show she used Turing's system in Illinois, her use of the system would be the Company's only connection to Illinois. Such would not establish personal jurisdiction over Turing in an Illinois court. *Stein*, 2021 WL 1020997, at **2-5.

Turing has no control over where its customers use their system. Plaintiff here alleges she was employed by a Jewel-Osco located in Illinois. Turing is not registered to do business in Illinois nor does it maintain offices, property, or bank accounts in Illinois. Ex. 1, ¶ 13. Of its 121 employees, only two remote employees are based in Illinois, hired in July and August 2021, after this action was filed. *Id*. Turing has not directed its Turing Shield marketing, sales, or commercial activity toward Illinois. *Id.* ¶ 14. Turing sold Albertsons the Turing Shield outside of Illinois, and the two companies never met or developed a business relationship in Illinois. *Id*. ¶ 15. Further, Turing never discussed with Albertsons whether its Turing Shield device would be used in Illinois and the companies never had a specific agreement about deploying or servicing the technology in Illinois. *Id.* ¶ 16. All of Albertsons' communications with Turing employees were with employees in California. *Id*. Turing does not specifically deploy its technology to Illinois or send its employees to Illinois. *Id.* ¶ 17. Turing, therefore, did not perform any of the alleged acts in Illinois nor did it collect any purported biometric information in Illinois. *See Salkauskaite*, 2020 WL 2796122, at *1 (dismissing BIPA claims for lack of personal jurisdiction where technology provider to retail chain had "no knowledge about the extent to which Sephora deploys its AR technology in Illinois").

Under these circumstances, it is well-settled that Plaintiff's BIPA suit fails for lack of personal jurisdiction. In *Salkauskaite*, an Illinois resident brought BIPA claims against Sephora USA, Inc. ("Sephora") and ModiFace, Inc. ("ModiFace"), alleging BIPA violations for collecting biometric information from customers' facial geometry at kiosks in Sephora stores. *Id.* at * 1. Plaintiff alleged Sephora operated the kiosks, but the kiosks used ModiFace's biometric technology. *Id.* ModiFace moved to dismiss for lack of personal jurisdiction arguing it "never had property, employees, or operations in Illinois," "did not target is marketing, sales, or commercial activity toward Illinois," "never discussed with Sephora whether its AR technology would be used in Illinois," and "never had a specific agreement about deploying or servicing the technology in Illinois." *Id.* at * 4. In granting ModiFace's motion, the court held that the evidence did not show ModiFace intending to avail itself to do business in Illinois despite its technology being used in Illinois. *Id*. at 5.

Similarly, in *Stein v. Claifai*, an Illinois resident claimed that Clarifai, a New York technology company, violated BIPA when it collected her biometrics with facial recognition technology. 2021 WL 1020997, at **1-2. Clarifai's product—a globally accessible website—is accessible in Illinois, even though "Clarifai does not target its website to residents in Illinois." *Id.* at *2. Like this case, "the only connection to Illinois is the fact that [plaintiff] resides here." *Id.* at *3. The *Clarifai* court dismissed the lawsuit, finding that the plaintiff "ha[d] not demonstrated that Clarifai directed its suit-related actions at Illinois." *Id.* at *4. *See also*, *Gullen v. Facebook.com, Inc.*, No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016) (dismissing defendant in BIPA class action for lack of personal jurisdiction "[b]ecause plaintiff does not allege that Facebook targets its alleged biometric collection activities at Illinois residents, the fact that its site is accessible to Illinois residents does not confer specific jurisdiction over Facebook."); *Bray v. Lathem Time Co.*,

7

No. 19-3157, 2020 WL 1492742, at *1 (C.D. Ill. Mar. 27, 2020) (defendant's conduct was limited to its widely accessible interactive website); *McGoveran v. Amazon Web Servs., Inc.*, 488 F. Supp. 3d 714, 721 (S.D. Ill. 2020) (complaint "does not allege any acts [defendant] committed in Illinois, let alone any acts committed in violation of BIPA . . . '[t]he mere fact that a defendant's conduct affects a plaintiff with connections to the forum State is not sufficient'") (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)); *Roiser v. Cascasde Mountain, Inc.*, 367 Ill.App.3d 559, 564, 855 N.E.2d 243, 249 (2006) (finding out of state defendant deriving some revenue from the residents of Illinois is an insufficient basis for inferring the defendant subjected itself to the jurisdiction of the Illinois courts.) Last, although this Court need not evaluate whether jurisdiction in Illinois would violate notions of fairness and substantial justice if it finds that there are not sufficient minimum contacts, *Salkauskaite*, 2020 WL 2796122, at *5, it would be unfair to subject a California entity with no contacts to Illinois to this Court's jurisdiction. *Bray*, 2020 WL 1492742, at *4 (personal jurisdiction violates fairness and justice when it is random and attenuated and where there is a lack of any suit-related contact). Such is the case with Turing.[2]

## II.     The Complaint Should Be Dismissed Under Rule 12(b)(1) Because Plaintiff's Claims Are Preempted By Section 301 of the LMRA

Plaintiff's BIPA claims against Turing are preempted by federal labor law and must go to arbitration. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407, 413 (1988) (U.S. Supreme Court holding that claims requiring interpretation of a collective bargaining agreement

---

[2] Turing's two remote Illinois employees also add nothing to establish minimum contacts with Illinois. *See Wiedemann v. Cunard Line Ltd.*, 63 Ill.App.3d 1024, 1032 (1st Dist. 1978) (finding defendant with two Illinois employees advertising and promoting its business in Illinois had not "transacted business" in Illinois within the meaning of the long-arm statute because the employees were not authorized to, and did not, contract with anyone in Illinois.); *Christopher (Rosemary T.), Est. of Christopher (Nick) v. Midwest Express Airlines, Inc*., No. 86 C 1750, 1986 WL 8756, at *1 (N.D. Ill. Aug. 4, 1986) ("A corporation that merely solicits business in Illinois is not "doing business.")

are preempted by the LMRA). The Seventh Circuit has made clear that Plaintiff's BIPA claims require interpretation of the CBA.

### A.  Plaintiff's claims require interpretation of the CBA's management rights clause

In *Fernandez v. Kerry, Inc.*, 14 F.4th 644, 646 (7th Cir. 2021), the Seventh Circuit held that BIPA claims, like those presented here, are preempted by the LMRA. *Fernandez* affirmed what had already been established by the Seventh Circuit in *Miller v. Southwest Airlines Co.*, 926 F.3d 898, 903–05 (7th Cir. 2019), that the collection of biometric data in the workplace is a working condition that is a subject of negotiation between the union and the employer. *Fernandez*, 14 F.4th at 646. Thus, all claims brought by unionized employees regarding whether an employer complied with BIPA are not properly resolved by a federal court. *Id.*

In *Fernandez*, former employees filed a lawsuit asserting that Kerry, Inc. violated BIPA by implementing a finger scan time clock and collecting the plaintiffs' biometric data without providing written notice and obtaining consent. *Id.* at 645. Kerry filed a motion to dismiss arguing that the plaintiffs' claims were preempted under the LMRA on grounds that the dispute would require interpretation of the CBA that governed the terms and conditions of plaintiffs' employment. *Id.* The district court granted Kerry's motion to dismiss, and plaintiffs appealed. *Id.*

On appeal, Kerry argued the dispute required interpretation of the CBA because there was a question whether the union consented to the collection and use of its members' biometric information when it agreed to the CBA's broad management-rights clause. *Id.* at 645. The court recognized that the union is the worker's agent and, as such, the union and employer are free to bargain on working conditions. *Id.* at 646. BIPA also says "a certified union is each worker's *exclusive* representative on collective issues." *Id.* The Seventh Circuit held the plaintiffs' claims were preempted by the LMRA stating, "Whether [the] unions did consent to the collection and

use of biometric data, or perhaps grant authority through a management-rights clause, is a question for an [arbitrator]." *Id.* (quoting *Miller*, 926 F.3d at 903). The court held that the plaintiffs' other BIPA claims also were preempted under LMRA, stating, "[s]imilarly, the retention and destruction schedules for biometric data, and whether [employers] may use third parties to implement timekeeping and identification systems, are topics for bargaining between unions and management." *Id.*

Plaintiff alleges Turing violated BIPA for failure to obtain informed written consent and a release before obtaining Plaintiff's biometric identifiers or information, and for disclosure of Plaintiff's biometric identifiers and information before obtaining consent. *See* Compl. ¶¶ 78-96. Like the plaintiffs in *Fernandez*, Plaintiff belonged to a union that entered into a CBA with her employer. (Ex. 2, ¶ 5). The CBA made the union her sole agent for purposes of collective bargaining, granting her employer broad management rights, and setting forth a grievance procedure that required disputes regarding the CBA to be handled in arbitration. (*Id.* at ¶ 3, attaching CBA at Section 1.1). Plaintiff alleges privacy claims regarding working conditions common to the entire workforce. The Seventh Circuit has clarified that privacy is an ordinary subject of bargaining under the LMRA to the extent privacy is a condition of employment. *Matter of Amoco Petroleum Additives Co.*, 964 F.2d 706, 709-10 (7th Cir. 1992) (plaintiffs' invasion-of-privacy claims about employer's use of video surveillance were preempted by the LMRA because "privacy in the workplace" is an "ordinary subject of bargaining," and "the extent of privacy is a condition of employment;" therefore, "a court could not award damages without first construing the collective bargaining agreement and rejecting [the employer's] interpretation of the management-rights clause"). Additionally, in *Miller*, the Seventh Circuit rejected the argument that BIPA's focus on privacy rights takes it outside the scope of labor law

preemption. *Miller* held, "[t]hat biometric information concerns workers' privacy does not distinguish it from many other subjects, such as drug testing, that are routinely covered by collective bargaining and on which unions give consent on behalf of the whole bargaining unit." *Miller*, 926 F.3d at 904. Accordingly, the Seventh Circuit held that it is not possible—even in principle—to address BIPA claims without considering what the union knew and consented to, which are questions for an arbitrator, not the court. *Id.* Thus, like *Fernandez*, it is not possible to "litigate a dispute about how "an [employee] acquires and uses [biometric] information for its whole workforce without asking whether the union has consented on the employees' behalf. That's why this dispute must go to an [arbitrator]." *Fernandez*, 14 F.4th at 646 (quoting *Miller*, 926 F.3d at 904).

Resolution of Plaintiff's claims necessarily requires the interpretation or administration of the CBA's provisions that address management rights, grievances, and arbitration. Plaintiff's employment was governed by a CBA that has been in effect since January 29, 2017. (Ex. 2, ¶ 3). The CBA applies to Plaintiff's position (Ex. 2, ¶ 5); the Union is the "sole collective bargaining agency for all its employees employed in the retail food stores" (Section 1.1); the CBA provides management with the right "to establish and maintain reasonable rules and regulations covering the operations of the store" (Section 8.11); and the CBA sets forth a grievance and arbitration system that covers "any dispute involving the interpretation or application of the provisions of the [CBA] (Sections 9.2-9.3). (Ex. 2, ¶ 3). The Union is the sole and exclusive bargaining agent for Plaintiff and other members of the putative class who are Union members. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2460 (2018); *Crooms v. Sw. Airlines Co.*, 459 F. Supp. 3d 1041, 1046 (N.D. Ill. 2020). Plaintiff's claims, thus, cannot be resolved without first

interpreting these relevant provisions. Like *Fernandez*, Plaintiff's claims must be dismissed to arbitration.

### B. The LMRA Preempts Plaintiff's BIPA Claims Even Though Turing Is Not A Signatory To The CBA

Turing's status as a non-signatory to the CBA does not preclude it from raising LMRA preemption because the resolution of Plaintiff's BIPA claims remains "inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985). Several courts have held that third parties and non-signatories to a CBA can invoke § 301 as a defense to a plaintiff's state law claims. *Kimbro v. Pepsico, Inc*., 215 F.3d 723, 727 (7th Cir. 2000) (state claims against third parties that require interpretation of collective bargaining agreements are preempted); *Brown v. Keystone Consol. Indus., Inc*., 680 F. Supp. 1212, 1223 (N.D. Ill. 1988) (acknowledging that "the preemptive reach of the NLRA would not be circumscribed to suits in which the defendant is an employer or a labor organization"); *see also Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 901–02 (S.D. Ohio 2007); *Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*, 977 F.2d 895, 899–900 (4th Cir. 1992) (holding § 301 of the LMRA preempted state law claim against non-signatory to CBA because state-law claims "would require a court to interpret the [CBA] between the Union and mining companies"); *Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL–CIO of Wash. D.C.*, 214 F. Supp. 2d 655, 668–69 (E.D. Va. 2002) (holding plaintiff's state law claim was preempted and concluding § 301 "preempts state law claims against non-signatories where interpretation of the agreement is required for resolution") (citing *Foy v. Giant Food, Inc.*, 298 F.3d 284, 290 n.4 (4th Cir. 2002)); *Golden v. Kelsey-Hayes Co.*, 878 F. Supp. 1054, 1057 (E.D. Mich. 1995) (holding plaintiff's state law claim against non-signatory to CBA was preempted by § 301). And that is precisely what Turing is doing here—defending against Plaintiff's BIPA

claims by challenging her ability to maintain state law claims where resolution of those claims requires interpretation of a CBA. Turing's status as a non-signatory to the CBA does not prevent it from raising the preemption defense under LMRA § 301.

## III. The Complaint Should Be Dismissed Under Rule 12(b)(6) For Failure To State A Claim For Which Relief Can Be Granted

### A. Plaintiff's Claims Are Barred by Illinois' Extraterritoriality Doctrine

Illinois' "extraterritoriality doctrine" bars a BIPA claim unless a Plaintiff "sufficiently allege[s] facts indicating that the circumstances relating to the alleged transaction occurred primarily and substantially in Illinois." *Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1090-91 (N.D. Ill. 2019) (*citing Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005)).

The Complaint should be dismissed because Plaintiff does not allege Turing's collection of biometrics occurred "primarily and substantially" in Illinois. *See id.* (dismissing BIPA claim for failure to "sufficiently allege facts indicating that the circumstances relating to the alleged transaction occurred primarily and substantially in Illinois," because plaintiff did not allege biometrics were "collected in Illinois"); *Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 758 (N.D. Ill. 2017) (dismissing claim under Illinois Uniform Fraudulent Transfer Act, stating: "in light of the complaint's allegations concerning the transactions in question, I cannot conclude that the relevant circumstances took place primarily and substantially in Illinois"). Recently, in *McGoveran*, a Delaware district court held that BIPA did not apply to a Delaware entity that took no active steps toward Illinois. *See McGoveran v. Amazon Web Servs., Inc. & Pindrop Security, Inc.*, No. CV 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021). The plaintiffs in *McGoveran* claimed their voiceprints were collected, possessed, redisclosed, and profited from in violation of BIPA when they called John Hancock for financial services from Illinois using Illinois telephone numbers. *Id.* at *2. Plaintiffs were directed to Defendants'

customer service representatives who allegedly captured their information through Defendants'
voiceprint authentication services. *Id*. Plaintiffs claims were initially filed in Illinois and dismissed
under Illinois' extraterritoriality doctrine because, "[n]othing about" the alleged course of conduct
"occurred in Illinois except for the initial dialing of the phone by Plaintiffs." *Id*. (*citing McGoveran
v. Amazon Web Servs., Inc*., 488 F. Supp. 714, 722 (S.D. Ill. 2020)).

Similar to the Illinois court, the Delaware district court found that the plaintiffs failed to
allege conduct that occurred primarily and substantially in Illinois. *Id*. *4. The court explained that
a plaintiff's residency alone is not sufficient to establish that the alleged conduct occurred
"primarily and substantially" in Illinois. *Id*. The court made clear that the plaintiffs' activities in
connection with John Hancock could not be ascribed to third-party contractors performing work
for the entity and that BIPA is not meant to apply to any business that may have been tangentially
exposed to Illinois. Specifically, the court stated:

> Finally, the Court notes that Plaintiffs have asked for the adoption of a rule that
> is overly broad and ultimately untenable. According to Plaintiffs, "under
> BIPA, as long as the source of the biometric data is Illinois, that's enough to
> establish liability." (Tr. at 44-45) That rule flies in the face of Illinois cases
> holding that a plaintiff's residency is not enough to survive a motion to dismiss
> based on extraterritoriality. *See, e.g., Vulcan Golf*, 552 F. Supp. 2d at 755.
> Furthermore, if that rule were correct, then BIPA could impose liability on a
> vast number of corporations who do no business in Illinois and who lack any
> other significant connection to Illinois. There is no basis in the statutory
> language to find that BIPAstretches so far. *Id*. at *6.

Similar to *McGoveran*, Plaintiff here attempts to use her residency alone to contend that
the alleged conduct occurred "primarily and substantially" in Illinois. Plaintiff alleges she was
employed at a Jewel-Osco that used Turing's COVID-19 kiosk to screen employees' temperatures
to be cleared for work, and that Turing, which is a Delaware corporation located in California,
"subsequently stored her biometric data in its systems and/or databases." Compl. ¶¶ 53-55. The
only connection Turing has to Illinois is Plaintiff's residency and, as discussed at length in

*McGoveran*, this alone is insufficient to establish that the alleged conduct occurred "primarily and substantially" in Illinois. In fact, Turing is exactly the kind of business *McGoveran* cautioned over which BIPA should not span—an out of state company that did not purposely direct its business toward Illinois and had no control over the steps taken by its customer after its product was purchased by them. *McGoveran* at *6. Plaintiff fails to allege facts establishing any connection between Turing and Illinois. Her claims should be dismissed because BIPA is an Illinois statute that cannot be applied extraterritorially.

### B. Plaintiff Has Failed to Plead that Turing Collected, Captured, or Possessed Any Biometric Information or Data

BIPA imposes certain requirements on entities that collect, capture, or possess "biometric identifiers" and "biometric information"—not other identifiers or information. 740 ILCS 14/15. BIPA defines "biometric identifiers" and "biometric information," in relevant part: (1) "'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10; and (2) "'Biometric information' means any information . . . based on an individual's biometric identifier used to identify an individual." *Id.*

Nowhere in the Complaint does Plaintiff allege that Turing collected *any* of the items set forth in the definitions above. Instead, Plaintiff claims that when her temperature was taken and when it was determined whether she had on a facemask—her "facial geometry" was collected. This is nonsensical. A scan of face geometry, under BIPA, is a "scan[]" by "facial recognition software" that "extracts a highly detailed 'map' or 'template' for each face based on its unique points and contours." *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846, at **1-5 (N.D. Ill. Sept. 15, 2017). Plaintiff's cursory allegations do not sufficiently allege Turing extracted any highly detailed map or template of her face based on its unique points and contours nor does Plaintiff allege any facts to plausibly support any allegation that Turing collected a scan of face

geometry. *McGoveran* at \*4. In *McGoveran*, the plaintiffs alleged that their "voice audio was intercepted" in Illinois. *Id.* The court found these cursory contentions insufficient because voice audio and a voiceprint are not the same – voice audio does not meet the definition of biometric information or a biometric identifier under BIPA. *Id.* at \*4. Similarly here, Plaintiff contends that her facial geometry was collected. *See* Compl. ¶ 54. Facial geometry is not the same as a "scan of face geometry" as defined under BIPA. *See* 740 ILCS 14/10.

Plaintiff also alleges that Turing used software to capture an individual's temperature and determine whether they had on a facemask. Compl. ¶¶ 4-7. Neither temperature taking nor the presence of a face-covering fall within BIPA's definitions of "biometric identifiers" and "biometric information." 740 ILCS 14/10. Nor does Plaintiff allege the thermal sensor is capable of identifying who the employee is based on temperature taking or facemask detection. Compl. ¶ 5-7. To find that either circumstance constitutes a scan of an individual's facial geometry would be contrary to the statute's purpose. Plaintiff's claim, therefore, ought to be dismissed.

### C.  Plaintiff's Claims Are Preempted by the PREP Act

The thermal sensor at issue here was designed and is used as a countermeasure to mitigate the impact of the COVID-19 pandemic; therefore, Turing is immune from any liability purported to have arisen from the use of such device. *See* Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d *et seq.* (the "PREP Act" or the "Act").

Pursuant to the PREP Act, the U.S. Secretary of the Department of Health and Human Services (the "Secretary") may issue a declaration providing immunity from liability for claims: (i) of loss caused, arising out of, relating to, or resulting from administration or use of countermeasures to diseases, threats and conditions; (ii) determined by the Secretary to constitute a present, or credible risk of a future public health emergency; and (iii) to entities and individuals involved in the development, manufacture, testing, distribution, administration, and use of such

countermeasures. PREP Act, 42 U.S.C. § 247d-6d(b). A covered person under the Act shall be immune from suit and liability under federal and state law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration by the Secretary has been issued with respect to such countermeasure. 42 USC 247d-6d(a)(1).

On January 31, 2020, the Secretary issued an emergency declaration acknowledging a number of confirmed cases of COVID-19, determining that a public health emergency exists, and triggering the availability of emergency health resources.[3] In March 2020, the Secretary invoked his authority under the PREP Act and issued a declaration proposing certain "Covered Countermeasures" to combat issues arising because of COVID-19 (hereinafter "PREP Act Declaration").[4]

The Declaration provided immunity for Covered Persons from liability arising from the use of Covered Countermeasures.[5] Pursuant to the PREP Act, a Covered Person includes any person or entity that manufacturers, distributes, administers, prescribes or uses Covered Countermeasures. PREP Act, 42 U.S.C. § 247d-6d(i)(2). A Covered Countermeasure includes *inter alia* a Qualified Pandemic or Epidemic Product. *Id.* A Qualified Pandemic or Epidemic Product means a drug, biological product, or device that is (A) manufactured, used, designed, developed, modified, licensed, or procured to: (i) diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or (ii) to limit the harm such pandemic or epidemic might otherwise cause;

---

[3] *See* U.S. Department of Health and Human Services ("HHS"), Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (relying on HHS authority under 42 U.S.C. § 247d).

[4] *See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medial Countermeasures Against COVID-19, § V, 85 Fed. Reg. 15,198, 15,202-02 (Mar. 17, 2020).

[5] *Id.*

and (B) approved, cleared, or authorized by the FDA. PREP Act, 42 U.S.C. § 247d-6d(i)(7). The *See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, § V, 85 Fed. Reg. 15,198, 15, 201-02 (Mar. 17, 2020). *Id.* Turing Shield is exactly the kind of pandemic-related device defined under the PREP Act and referred to in the Secretary's Declaration.

The PREP Act adopts the Food, Drug, and Cosmetic Act definition of a medical "device" which includes a machine intended for use to mitigate a disease. 21 U.S.C. § 321(h), attached as Ex. 3. When a temperature measuring device is intended for possible screening diagnostic purposes, the Food and Drug Administration ("FDA") recognizes it as a medical device that is subject to FDA regulation and clearance. 21 C.F.R. § 884.2980(a).[6] The purpose of the Turing Shield is for COVID-19 screening (Compl. ¶ 3, "Turing manufactures [] the Turing Shield, a COVID-19 response Kiosk that provides businesses with COVID-19 screenings for employees."), and it helps "businesses comply with COVID-19 regulations and help[s] safeguard their employees and customers." Compl. ¶ 2. Thus, the Turing Shield is used for an activity authorized according to a public health and medical response—temperature screening for retail businesses, including grocery store employees.[7] *See* PREP Act Declaration, Section VII.

Plaintiff alleges that while employed at Jewel-Osco she was required to use a Turing Shield as part of a COVID-19 screening process to be cleared for work. Compl. ¶ 54. The Turing Shield includes a thermal sensor to measure a person's temperature to determine if they have a fever,

---

[6] *See also Thermal Imaging Systems (Infrared Thermographic Systems / Thermal Imaging Cameras*, U.S. FOOD & DRUG ADMINISTRATION, available at: https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/thermal-imaging-systems-infrared-thermographic-systems-thermal-imaging-cameras.

[7] Illinois Department of Commerce and Economic Opportunity, COVID-19 2020 Retail Guidelines, (attached as Ex. 4), at 1, 3 ("Examples of retail include (non-exhaustive): grocery stores;" "Employers should make temperature checks available for employees and encourage their use. … All employers should have a wellness screening program…" (citing CDC Interim Guidance for Businesses and Employers)).

which is a potential symptom of COVID-19. Compl. ¶ 5.[8] The device can also determine whether an individual is wearing a mask. *Id*. If all requirements are met, a badge is printed which allows the individual to enter the workplace. *Id*. at ¶ 7. This kind of device is designed to mitigate, prevent, and limit further harm that may be caused by the COVID-19 pandemic. *Id.* at ¶ 3.

Generally, a thermal sensory device requires FDA premarket review and clearance.[9] Due to the COVID-19 public health emergency, however, the FDA will not object to the distribution and use of a thermal sensory device without formal clearance provided the product satisfies the parameters of its guidance policy—such as, initial temperature assessment for COVID-19 triage use in high throughput areas, including businesses—and accordingly, treats an individual device as if cleared. *See Enforcement Policy* at 1-2. The Turing Shield complies with the Policy. Thus, taken together, the Turing Shield is a Covered Countermeasure as a Qualified Pandemic or Epidemic Product.

As a manufacturer of the Turing Shield, Turing is a "Covered Person" under the Declaration. Compl. ¶ 3; PREP Act Declaration, Section V. Given that Turing is a Covered Person under the PREP Act and the Turing Shield was developed as and deemed a Covered Countermeasure to the COVID-19 health emergency, Turing is immune from liability for any claim raised by Plaintiff. Therefore, Plaintiff's claims should be dismissed.

---

[8] *Id.* at 2.

[9] *Enforcement Policy for Telethermographic Systems During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency: Guidance for Industry and Food and Drug Administration Staff (April 2020),* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION CENTER FOR DEVICES AND RADIOLOGICAL HEALTH, OFFICE OF PRODUCT EVALUATION AND QUALITY, at 4, available at https://www.fda.gov/media/137079/download (hereinafter "*Enforcement Policy*"); *see also* 21 C.F.R. § 884.2980(a).

## <u>CONCLUSION</u>

For the reasons discussed herein, Turing respectfully requests that this Court dismiss Plaintiff's Class Action Complaint.

Dated: January 25, 2022

Respectfully submitted,

**TURING VIDEO**

By:  */s/ Erin Bolan Hines*
     One of Its Attorneys

Melissa A. Siebert (masiebert@shb.com)
Erin Bolan Hines (ehines@shb.com)
Ambria D. Mahomes (amahomes@shb.com)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
Fax: (312) 558-1195

*Attorneys for Defendant Turing Video*

**CERTIFICATE OF SERVICE**

I, Erin Bolan Hines, an attorney, hereby certify that on January 25, 2022, I caused a true and correct copy of the foregoing **TURING VIDEO'S MEMORANDUM OF LAW IN SUPPORT OF ITS AMENDED MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT** to be filed via the Court's ECF filing system and served on the following counsel of record via Electronic Mail:

> Ryan F. Stephan
> James B. Zouras
> Andrew C. Ficzko
> STEPHAN ZOURAS, LLP
> 100 N. Riverside Plaza, Suite 2150
> Chicago, IL 60606
> rstephan@stephanzouras.com
> jzouras@stephanzouras.com
> aficzko@stephanzouras.com
>
> *Attorneys for Plaintiff*

/s/ *Erin Bolan Hines*