IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA TRIO, individually and on behalf   )
of all others similarly situated,   )
  )
     Plaintiff,   )     Case No. 1:21-cv-04409
  )
     v.   )     Judge John Robert Blakey
  )
TURING VIDEO, INC.,   )
  )
     Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Trio filed this putative class action lawsuit in state court alleging that Defendant Turing Video, Inc. ("Turing") violated the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.* when it collected, stored, and disseminated Plaintiff's biometric information. [1-1]. Invoking jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), [1], Turing removed the lawsuit to this Court and now seeks dismissal of Plaintiff's complaint pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6), [27]. For the reasons explained below, the Court denies Turing's motion [27].

## I.    Facts

The following facts are taken from Plaintiff's complaint, [1-1], and are assumed to be true for purposes of Turing's amended motion to dismiss, [27].

Defendant Turing Video, Inc., a California corporation with its principal place of business in California, sells products integrated with artificial intelligence, which

provide security and health solutions to companies across an array of industries. *Id.* ¶¶ 1, 25. Specific to this lawsuit, Turing produces and sells various technologies that allow businesses to safeguard their employees and customers and assist them in complying with COVID-19 restrictions. *Id.* ¶ 2. Chief among these products is the Turing Shield, a kiosk that allows Turing's customers to screen their employees for COVID-19. *Id.* ¶¶ 3, 42.

The Turing Shield works by scanning the biometric data of its users. *Id.* ¶ 42. First, the Turing Shield prompts a user to complete a health questionnaire on the user's phone. *Id.* ¶ 4. Once the user completes the questionnaire, a QR code appears on the user's phone that the Turing Shield then scans to initiate a temperature screening. *Id.* To collect a temperature screening, users stand in front of the Turing Shield's camera, which collects the user's facial geometry and signals an alert when the Turing Shield's "artificial intelligence algorithm" recognizes the user. *Id.* ¶ 5. From there, the algorithm locates the user's forehead and signals the Turing Shield's built-in thermal sensor to collect the user's forehead temperature. *Id.* The Turing Shield's facial recognition software can also detect whether the user is wearing a mask. *Id.* The Turing Shield then stores the data collected from the COVID-19 screening in the Turing database, which can store up to 20 million "faces." *Id.* ¶ 6.

After the Turning Shield collects and stores a user's data in its database, it analyzes the data it collected to determine if the user passed the COVID-19 screening process. *Id.* ¶ 7. If the user provided satisfactory results for the health questionnaire, temperature screening, and mask detection, then the Turing Shield prints a badge

that indicates the user is cleared to enter the work environment. *Id.* For a negative screening result, the Turing Shield prints a badge indicating the user has failed the screening. *Id.*

Turing's databases store the individuals' facial geometry scans, along with the users' temperature, health questionnaire responses, and face mask detection results, to track and report individuals who may have been exposed to COVID-19. *Id.* ¶ 43. Turing's customers can access the data collected by the Turing Shield by subscribing to Turing's Data Access Management Platform, a software program that provides Turing's customers with centralized monitoring and reporting to identify users of the Turing Shield who may have been exposed to COVID-19. *Id.* ¶ 8. The software program is cloud-based, which means data collected and obtained from the Turing Shield is transmitted to Turing's servers and other third parties who host that data such as Amazon Web Services. *Id.* ¶ 44. Turing accesses its servers for various purposes, including support services for its customers. *Id.* ¶ 45.

From April 2019 to June 2021, Plaintiff worked as a cake decorator for New Albertson's, Inc. d/b/a Jewel-Osco at a location in Algonquin, Illinois. *Id.* ¶ 53. While employed by Jewel-Osco, Plaintiff was required to use the Turing Shield each time she began her workday as part of the store's COVID-19 screening process. *Id.* ¶¶ 54, 56. Turing stored the biometric data obtained from Plaintiff's use of the Turing Shield in its databases, and later disseminated it to third parties such as Amazon Web Services. *Id.* ¶¶ 55, 63. Turing never informed Plaintiff of any limits on the purpose of using such information or about any limits on the length of time for which Turing

would collect, store, use, and disseminate her biometric data. *Id.* ¶ 57. Plaintiff was never provided with, nor did she ever sign, a written release authorizing Turing to collect, store, use, or disseminate her biometric data. *Id.* ¶ 58.

On July 2, 2021, Plaintiff filed this lawsuit in Illinois state court, alleging that Turing violated Section 15(b) of BIPA when it failed to obtain her informed written consent and release prior to collecting her biometric identifiers and biometric information (Count I) and violated Section 15(d) of BIPA when it disseminated her biometric identifiers and biometric information to third parties without first obtaining her consent (Count II). *Id.* ¶¶ 78–87, 88–96. Plaintiff, individually and on behalf of a class of all other individuals in Illinois who had their biometric data collected, stored, used, and disseminated by Turing, seek declaratory and equitable relief, statutory damages, and reasonable attorneys' fees and other expenses provided for under BIPA. *Id.* ¶¶ 68, 87, 96.

After timely removing this lawsuit to this Court on August 18, 2021, [1], Turing moves to dismiss Plaintiff's claims pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, [27].

## II.  Legal Standard

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). If a defendant challenges the facial sufficiency of the allegations regarding subject matter jurisdiction, the Court must accept as true all well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009).

But where the complaint is "facially sufficient but external facts call the court's jurisdiction into question, we 'may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (quoting *Apex Digital, Inc.*, 572 F.3d at 444)).

A motion to dismiss under Rule 12(b)(2) challenges the Court's personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). Under Rule 12(b)(2), a complaint need not include facts alleging personal jurisdiction; but once the defendant moves to dismiss the complaint under Rule 12(b)(2), the plaintiff bears the burden of demonstrating the existence of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, the Court rules on a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only establish a prima facie case of personal jurisdiction. *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 392-93 (7th Cir. 2020); *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). Where the defendant "has submitted affidavits or other evidence in opposition to the exercise of jurisdiction," however, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research Found.*, 338 F.3d at 783. The Court accepts as true any facts in affidavits that do not conflict with the complaint or the plaintiff's submissions, *Curry*, 949 F.3d at 393, but the Court must resolve any disputes concerning the relevant facts in the plaintiff's favor. *Purdue Research Found.*, 338 F.3d at 782–83.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), a complaint must allege "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In evaluating the complaint, this Court draws all reasonable inferences in the plaintiff's favor and accepts as true all well-pled allegations; the Court need not, however, accept legal conclusions or conclusory allegations. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681). Unlike motions to dismiss under Rule 12(b)(1) and 12(b)(2), however, the Court may not consider matters outside of the pleadings. *See Geinosky v. City of Chi.*, 675 F.3d 743, 746 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").

## III.  Analysis

Turing moves to dismiss Plaintiff's complaint: under Rule 12(b)(1), arguing that her claims are preempted under Section 301 of the Labor Management Relations Act ("LMRA"), [28] at 8–12; under Rule 12(b)(2), arguing that the Court lacks personal jurisdiction over it; and under Rule 12(b)(6) on the basis that Plaintiff's

claims are barred by Illinois' extraterritoriality doctrine and the federal Public Readiness and Emergency Preparedness Act, and that the complaint fails to state a claim under BIPA, *id.* at 5–19. As "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits,'" *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil. Co.*, 526 U.S. 574, 585 (1999), the Court first considers its personal jurisdiction over Turing and then turns to the issue of subject-matter jurisdiction.

## A. Personal Jurisdiction

A federal court sitting in diversity may exercise personal jurisdiction over a defendant if authorized by the forum state's long-arm statute and the United States Constitution. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). Illinois' long arm statute provides that a court may also exercise jurisdiction "on any basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). Because the Seventh Circuit has found no "operative difference" between the two constitutional limits, this Court will limit its analysis to whether exercising jurisdiction over Turing comports with the Due Process Clause of the Fourteenth Amendment. *Illinois v. Hemi Group LLC*, 622 F.3d 754, 756–57 (7th Cir. 2010).

Under well-established law, the Court may exercise personal jurisdiction over nonresidents only when they have "minimum contacts" with Illinois such that litigating the case here "does not offend traditional notions of fair play and

substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two types of personal jurisdiction, general jurisdiction and specific jurisdiction.

General jurisdiction exists when the defendant's affiliations with the forum state "are so constant and pervasive as to render [it] essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal quotation marks omitted). For a corporation, this encompasses the state of its incorporation or the state where it maintains its principal place of business. *Id.* at 139. Here, Plaintiff has not shown that this Court may exercise general jurisdiction over Turing because the complaint alleges that Turing's place of incorporation and principal place of business is in California, [1-1] ¶ 25, and Turing's unrebutted evidence demonstrates that Turing lacks the "continuous and systematic contacts as to render it essentially home" in Illinois, *Daimler AG*, 571 U.S. at 139 (cleaned up); *see also* [28-1].[1] Thus, the Court cannot exercise general personal jurisdiction over Turing based upon the record before it.

The next type of personal jurisdiction, specific jurisdiction, depends upon the facts of the case and exists when a defendant has "purposefully directed his activities at residents of the forum" and "the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (internal quotation marks omitted); *see also Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1781 (2017). ("[T]here must be 'an

---

[1] The parties submitted extrinsic evidence relevant to the Court's exercise of jurisdiction over Turing, which the Court considers solely for Turing's Rule 12(b)(2) motion to dismiss. *See Purdue Research Found.*, 338 F.3d at 782; *Curry*, 949 F.3d at 393.

affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). A court's specific jurisdiction inquiry must focus on the "'relationship among the defendant, the forum, and the litigation,'—the "essential foundation' of specific jurisdiction." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). As part of this process, the Court first determines whether the evidence demonstrates Turing has sufficient contacts with Illinois and whether those contacts "arise out of or relate to" Plaintiff's claims. *See Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State.").

As an initial matter, Turing argues that this Court does not have specific jurisdiction because Turing, a non-forum resident, sold the Turing Shields that relate to Plaintiff's injuries to Albertsons, Plaintiff's employer (and a non-forum resident), and that Albertsons brought the Turing Shields it purchased from Turing into Illinois without discussion or prior notification to Turing. [28] at 12. In support of its Rule 12(b)(2) motion to dismiss, Turing submits the declaration of Xing Zhong, Turing's Co-Founder and Chief Operating Officer, [28-1]. Zhong states that Albertsons is one of Turing's customers, and the two entered into a contractual relationship on April 4, 2020, whereby Albertson bought Turing's Turing Shield kiosks to mitigate the spread of COVID-19 at Albertsons' stores. *Id.* ¶ 13. Turing does not otherwise have a

9

contractual relationship with Jewel-Osco. *Id.* Zhong also avers that Turing is not registered to do business in Illinois, does not maintain offices, property, or bank accounts in Illinois, did not purposely target Illinois in the marketing and sales of Turing's products, and that of its 121 employees, 82 are based in California and only two are in Illinois, both of whom were hired after Plaintiff filed this lawsuit. *Id.* ¶¶ 13–14. With respect to Albertsons, Zhong states that Albertsons only communicated with Turing's California-based employees, that Turing sold Albertsons the Turing Shield outside of Illinois, and that the two companies never met or developed a business relationship in Illinois, had no specific agreement about deploying or servicing the Turing Shield in Illinois, and had no discussions about whether Albertsons would use the Turing Shields in Illinois. *Id.* ¶ 15.

In opposition to Turing's Rule 12(b)(2) motion, Plaintiff submits Turing's responses to Plaintiff's Interrogatories, [35-3], and dozens of purchase orders involving the sale or shipment of Turing Shields to customers in Illinois, [37-2]. Both parties also submit excerpts of a transcript from Zhong's deposition taken on the issue of personal jurisdiction. [37-1]; [43-1]. The evidence demonstrates that, since Spring 2020, Turing had at least 30 customers in Illinois during the relevant period and that the purchase orders confirm it sold and shipped Turing Shields to customers in Illinois on various occasions. [35-3] at 7–8; [37-1] at 42:10–24, 58:12–15, 104:12–21; [37-2]; [43-1] at 42:10–24, 58:12–15, 104:12–21, 104:16–105:2. In fact, one purchase order indicates that Turing may have sold 106 Turing Shields to an Illinois-based

customer for nearly $366,000.00 and the 106 Turing Shields were to be shipped to an Illinois address. [37-2] at 7–8.

Overall, the Court finds that Plaintiff's proffered evidence demonstrates that Turing has the requisite minimum contacts with Illinois for purposes of specific personal jurisdiction.[2] While Turing insists that the Court cannot assert jurisdiction over it because Turing has no physical presence in the state, *see* [28] at 11; [43] at 9, "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state," *Curry*, 949 F.3d at 398. Rather, the existence of minimum contacts with the forum state turns on whether the defendant has "purposefully directed his activities" to the forum. *Id.* (quoting *Burger King*, 471 U.S. at 476). In other words, the "inquiry boils down to this: has [Turing] purposely exploited the Illinois market?" *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011). The record here demonstrates that Turing has done so. Turing has at least 30 customers in Illinois and executed purchase orders with Illinois customers for the

---

[2] The parties quibble over the relevance of certain facts that occurred *after* Plaintiff brought suit, such as Turing's hiring of two Illinois-based employees and Turing sending its employees to conferences hosted in Illinois. The Seventh Circuit has not addressed whether a court should consider a defendant's contacts with the forum state that occurred after the filing of the lawsuit, but several district courts have reasoned that post-filing conduct cannot provide defendants with the "fair warning" required under the due process analysis for specific jurisdiction. *See, e.g., United Phosphorus, Ltd. v. Angus Chemical Co.*, 43 F. Supp.2d 904, 911 (N.D. Ill. 1999) ("While pre-suit activities may rise to the level of a 'fair warning' that a defendant may be haled into a court in the forum state, post-suit activities cannot serve to warn the defendant of an event that has already occurred."); *Haggerty Enterprises, Inc. v. Lipan Indus. Co.*, No. 00 C 766, 2001 WL 968592, at *4 (N.D. Ill. Aug. 23, 2001) (declining to consider facts that occurred after the filing of the complaint "because jurisdiction is generally determined by facts existing at the case filing."); *NTE LLC v. Kenny Construction Company*, No. 14 C 9558, 2015 WL 6407532, at *5 (N.D. Ill. Oct. 15, 2015) ("[P]ost-filing contacts cannot serve the Due Process purpose of the minimum contacts doctrine—that is, they cannot give the defendant fair warning that he could be 'haled into court in the forum state' before the lawsuit is filed."). The Court need not decide this issue now because Turing has sufficient pre-suit contacts with Illinois notwithstanding any contacts it may have had with the state *after* Plaintiff filed her lawsuit.

sale and shipment of Turing Shields.  Thus, Turing's contacts with Illinois are not the result of "random, fortuitous, or attenuated" circumstances or due to the "unilateral activity of another party or third person," *Curry*, 949 F.3d at 396, but indicate Turing engaged in commercial activity purposefully directed at Illinois sufficient to hale it into Illinois courts.  *See id.* at 398 ("[S]uch 'purposeful direction' may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state.  For example, a defendant may cause its product to be distributed in the forum state."); *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) ("For no matter which party got the ball rolling, if Optibase intentionally served the Wisconsin market, Optibase purposefully established sufficient minimum contacts to subject it to personal jurisdiction in Wisconsin."); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").  And although Turing argues that it had a nationwide marketing strategy for its Turing Shield and did not specifically target Illinois, [43] at 8, "[t]here is no per se requirement that the defendant especially target the forum in its business activity," *Curry*, 949 F.3d at 399.  In any event, the Seventh Circuit has found similar arguments unpersuasive especially where, as here, the evidence indicates that Turing derived revenue from its sale of the Turing Shield to dozens of Illinois customers.  *See, e.g. uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 428–29 (7th Cir. 2010) ("[I]t is easy to infer that GoDaddy's

national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state."); *Illinois v. Hemi Group LLC*, 622 F.3d 754, 758 (7th Cir. 2010) (finding sufficient contacts with Illinois where defendant's website stated it does business with the residents of forty-nine states and evidence demonstrated that it "knowingly did do business with Illinois residents.").

The cases cited by Turing in support of its argument all involve facts where the defendant lacked *any* contacts with the relevant forum state or that the contacts with the forum state did not demonstrate that defendant had "purposefully availed" or otherwise targeted residents of the forum state. *See Salkauskaite v. Sephora USA, Inc.*, No. 18-cv-08507, 2020 WL 2796122, at *4–5 (N.D. Ill. May 30, 2020) (finding no personal jurisdiction where evidence showed defendant had not provided its technology to Illinois customers and where its only Illinois-related contact was a social media post discussing the use of its technology at a customer's Illinois location); *Stein v. Clarifai, Inc.*, 526 F. Supp. 3d 339, 345 (N.D. Ill. 2021) (finding no personal jurisdiction where defendant derived only 7 cents in revenue from two Illinois customers who interacted with defendant through a website); *Gullen v. Facebook.com, Inc.*, No. 15 C 7681, 2016 WL 245910, at *2–3 (N.D. Ill. Jan. 21, 2016) (finding no personal jurisdiction where complaint's only allegation of defendant's forum-related contact was that defendant operated a website accessible to Illinois residents); *Bray v. Lathem Time Co.*, No. 19-3157, 2020 WL 1492742, at *4 (C.D. Ill. Mar. 20, 2020) (finding no personal jurisdiction where unrebutted evidence

demonstrated that defendant's only Illinois-related contact was the operation of a website accessible to its Illinois customers); *McGoveran v. Amazon Web Servs., Inc.*, 488 F. Supp. 3d 714, 722 (S.D. Ill. 2020) ("[T]here is no indication that either of these companies purposefully directed their activities at Illinois residents."); *Roiser v. Cascade Mountain, Inc.*, 855 N.E.2d 243, 248 (Ill. App. Ct. 2006) ("The Rosiers' lawsuit is not based on any activity within Illinois; therefore, specific jurisdiction principles are not relevant to their appeal."). In contrast to the cases cited by Defendant, the evidence here demonstrates that Turing specifically targeted Illinois and its residents in the sale of its products.

In addition to establishing the existence of sufficient minimum contacts, Plaintiff must demonstrate that the contacts "arise out of or relate to" the litigation. Turing argues that its contacts with Illinois are "non-suit related business operations" and that its Illinois contacts have no causal connection to Plaintiff's claims. [43] at 8. But this is precisely the sort of argument the Supreme Court rejected in *Ford Motor Co. v. Montana Eight Judicial District Ct.*, where the Court held that it has "never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claims came about because of the defendant's in-state conduct." 141 S. Ct. at 1026. Rather, the inquiry requires that a plaintiff's lawsuit "arise out of *or* relate to" the defendant's contacts with the forum state, which "contemplates that some relationships will support jurisdiction without a causal showing." *Id.*

14

*Ford Motor Co.* involved two product liability lawsuits brought in Montana and Minnesota state courts against the manufacturer of a vehicle that caused the plaintiffs injuries in the forum states. *Id.* at 1022. The defendant argued that its contacts with the forum states—limited to advertising, maintaining car dealerships, and providing parts and services for its products in the forum states—had no causal relationship to plaintiffs' claims because it designed, manufactured and sold the vehicles that caused their injuries outside of the forum states, and because plaintiffs had obtained the specific vehicles involved in their injuries through later resales. *Id.* at 1023. The Supreme Court disagreed, noting that although there are "real limits" to this inquiry, a "strong relationship among the defendant, the forum, and the litigation" exists because defendant's contacts indicated that it "had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those states." *Id.* at 1029.

Here, Turing's contacts with Illinois, like the defendant in *Ford Motor Co.*, "relate to" Plaintiff's claims because Turing's contacts with Illinois involve sales of the very same Turing Shields that led to Plaintiff's alleged injury. Like the plaintiffs in *Ford*, Plaintiff here is a resident of the forum state, and used the same Turing Shield that Turing has sold and shipped to other Illinois customers. And because Plaintiff's injuries arise from her use of the Turing Shield in Illinois without the protections afforded to her under Illinois law, she brought this lawsuit "in the most natural state—based on an 'affiliation between the forum and the underlying

controversy, principally, an activity or an occurrence that took place there." *Id.* (quoting *Bristol-Myers*, 137 S. Ct., at 1179–80).

Finally, the Court must determine whether asserting jurisdiction over a defendant "offends traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. To do so, the Court considers "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies." *Purdue Research Found.*, 338 F.3d at 781 (internal quotation omitted). As the Seventh Circuit has noted, "as long as the plaintiff has made a threshold showing of minimum contacts, that showing is generally defeated only where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Curry*, 949 F.3d at 402 (quoting *Burger King*, 471 U.S. at 477). Here, Turing simply argues that "it would be unfair to subject a California entity with no contacts to Illinois to this Court's jurisdiction." [43] at 15–16. But, as discussed above, Turing has sufficient contacts with Illinois that relate to the claims brought by Plaintiff, and it points to no other reason that would render jurisdiction otherwise unreasonable or unfair. *See Curry*, 949 F.3d at 402 ("There is no unfairness in requiring a defendant to defend a lawsuit in the courts of the state where, through the very activity giving rise to the suit, it continues to gain so much."); *Hemi*, 622 F.3d at 760 (finding that jurisdiction in Illinois was fair where defendant had

established an "expansive, sophisticated commercial venture online," held itself out to conduct business nationwide, and succeeded in reaching customers across the country."). In any event, the Court finds Illinois has a strong interest in providing a forum for individuals who wish to seek redress for BIPA violations even if a non-forum resident inflicted the alleged harms and Plaintiff here seeks to represent a class of all individuals in Illinois who had their biometric data collected by Turing. *See* [1-1] ¶ 68. Accordingly, the Court denies Turing's Rule 12(b)(2) motion to dismiss.

### B. Subject-Matter Jurisdiction: Preemption Under the LMRA

Turing next argues that this Court lacks subject-matter jurisdiction over Plaintiff's claims because they are preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

Section 301 of the LMRA establishes federal jurisdiction over "suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce" without respect to the amount in controversy or citizenship of the parties. 29 U.S.C. § 185(a). The Supreme Court has interpreted this provision as one that "expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations." *Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 455 (1957). This federal policy would be thwarted, however, if the resolution of Section 301 claims involved conflicting applications of state and federal law. *See Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Lucas Flour*, 369 U.S. 95, 103 (1962) ("The possibility that individual contract terms might have different meanings

under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements."). Thus, Section 301 "completely preempts state law claims 'founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Sarauer v. Int'l Ass'n of Machinists and Aerospace Workers, District No. 10*, 966 F.3d 661, 670 (7th Cir. 2020) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)); *see also Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) ("The Court has understood this to be a rule that overrides all possible applicable state law, or, in other words, as a rule of complete preemption.").

Here, Turing argues that Plaintiff, a union-represented employee, is subject to a collective bargaining agreement ("CBA") with her employer and thus, resolving Plaintiff's BIPA claims against Turing for alleged injuries she sustained through her work would require the Court to interpret the CBA between her union and her employer. [28] at 15. This, Turing argues, would mean that Section 301 of the LMRA preempts Plaintiff's BIPA claims.

In response, Plaintiff argues that Section 301's preclusive effect only applies to state law claims involving parties bound by a CBA. [37] at 22. That suggestion, however, does not frame the inquiry quite right. Rather, as noted by Turing, [28] at 18, the preclusive effect of Section 301 turns on whether resolution of the state law claim would require a court to interpret a collective-bargaining agreement. *See, e.g.*, *Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000) (holding a state law claim

against non-signatories preempted by Section 301 because "[i]t was inevitable that the collective bargaining agreement between [plaintiff's employer] and [plaintiff's union] would be brought into this suit had it been allowed to proceed to trial."). Thus, the Court must ask whether the Court will need to interpret a CBA to resolve Plaintiff's BIPA claim.

First, as a general matter, the Seventh Circuit has held that federal law preempts BIPA claims brought by certain union-represented employees against their employers. In *Miller v. Southwest Airlines Co.*, 926 F.3d 898 (7th Cir. 2019) and later in *Fernandez v. Kerry, Inc.*, 14 F.4th 644 (7th Cir. 2021), the Seventh Circuit held that whether a union consented (as the collective bargaining representative for plaintiffs) to the collection of biometric data on their members' behalf (either expressly or through the CBA's management-rights clause) constituted a question for either an adjustment board under the Railway Labor Act (as was the case for the plaintiffs in *Miller*) or by an arbitrator under the LMRA (as was the case for the plaintiffs in *Fernandez*), because BIPA provides that an individual's "legally authorized representative" may receive the required notices and provide the informed written consent to the private entity that obtains and/or disseminates the individual's biometric information. 740 ILCS 14/15(b), (d); *see also Miller*, 926 F.3d at 903; *Fernandez*, 14 F.4th at 645–46. Because it was "not possible even in principle to litigate a dispute about how an [employer] acquires and uses fingerprint information for its whole workforce without asking whether the union has consented on the employees' collective behalf," *Miller*, 926 F.3d at 904; *Fernandez*, 14 F.4th at 646

19

(quoting *Miller*, 926 F.3d at 904)), the Seventh Circuit held in *Miller* and *Fernandez* that "state law is preempted to the extent that a state has tried to overrule the union's choices on behalf of the workers." *Miller*, 926 F.3d at 904; *see also Fernandez*, 14 F.4th at 646 ("States cannot bypass the mechanisms of [federal law] and authorize direct negotiation or litigation between workers and management.") (quoting *Miller*, 926 F.3d at 904).

These general principles, however, do not require Section 301 preemption of Plaintiff's BIPA claims here, because resolution of Plaintiff's BIPA claims does not depend upon the interpretation of the CBA between Plaintiff's union and her employer, Jewel-Osco. By its very terms, BIPA requires each "private entity" to comply with its requirements before it obtains or disseminates an individual's biometric identifiers or biometric information. *See* 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information . . . "), (d) ("No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information . . . "); *see also Figueroa v. Kronos*, 454 F. Supp.3d 772, 784 (N.D. Ill. 2020) ("Kronos still was a 'private entity' that 'collect[ed]' or 'obtain[ed]' Plaintiff's data, and thus remained obligated to receive a release from them as a condition of their employment.").

Unlike the CBAs at issue in *Fernandez*, Turing was not a party to the collective bargaining agreement between Plaintiff's union and her employer, Jewel-Osco. *See*

[28-2][3] at ¶ 3; [28-2] at 5 ("THIS AGREEMENT entered into this 29th day of January, 2017, by and between JEWEL FOOD STORES, INC., a corporation, hereinafter called the "Employer",[sic] and the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 881, a voluntary association, hereinafter referred to as the "Union".[sic]"). Nor does Turing "have a contractual relationship with Jewel-Osco." [28-1] ¶ 12. As a non-party to the CBA, Turing's obligations under BIPA stand wholly independent of whether Plaintiff's union may have consented to Jewel-Osco, her *employer*, collecting and disseminating her biometric data. In other words, resolution of the state law BIPA claims would not require this Court to interpret any collective-bargaining agreement, and instead depend upon the entirely unrelated question of whether Turing provided Plaintiff with the necessary disclosures and obtained from her the required written release before it collected and disseminated her biometric information.

Turing's preemption argument rests on a fundamental misunderstanding of Section 301 of the LMRA and relies on an overly broad reading of *Fernandez* which, if accepted, "would be inconsistent with congressional intent under [Section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Caterpillar*, 482 U.S. at 395 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 212 (1985)) (cleaned up). Accordingly, Plaintiff's claims are not preempted by Section 301 of the LMRA.

---

[3] Because Turing presents external facts challenging the Court's subject matter jurisdiction over Plaintiff's claims, the Court considers the copy of the CBA attached to Turing's memorandum in support of its Rule 12(b)(1) motion to dismiss, [28-2]. *See Taylor*, 875 F.3d at 853.

B.    **Turing's Rule 12(b)(6) Motion to Dismiss.**

    a.  **Illinois' Extraterritoriality Doctrine**

Turing next moves for dismissal under Rule 12(b)(6), arguing that Plaintiff's complaint fails to allege that Turing's collection of biometric information occurred primarily and substantially in Illinois and should be barred under Illinois' extraterritoriality doctrine.  [28] at 19.

Under Illinois law, "a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute."  *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005).  Absent such an intent in the statute, a plaintiff may sue under an Illinois statute only if "the circumstances that relate to the disputed transaction occur[red] primarily and substantially in Illinois." *Id.* at 854.  Plaintiff does not dispute that BIPA has no extraterritorial application but argues that her complaint sufficiently alleges that the relevant conduct occurred "primarily and substantially" in Illinois.  [37] at 26.  The Court agrees.

Here, Plaintiff's complaint sufficiently alleges that the relevant conduct giving rise to her BIPA claims occurred primarily and substantially in Illinois.  The Illinois Supreme Court in *Avery*—which considered a claim brought pursuant to the Illinois Consumer Fraud Act—explained that to determine if a claim occurred primarily and substantially in Illinois, a court must consider the "totality of circumstances" including such factors as:  a plaintiff's residency, the location of the harm, where the

22

parties sent and received communications, and where the defendant carried out any policy at issue. 835 N.E.2d at 852.

Turing insists that Plaintiff "attempts to use her residency alone to contend the alleged conduct occurred 'primarily and substantially' in Illinois." [28] at 20. Not so. While residency of the plaintiff is but one factor to be considered and likely would not suffice without more, *see Rivera v. Google Inc.*, 238 F. Supp.3d 1088, 1101 (N.D. Ill. 2017), Plaintiff also alleges that, while working as a cake decorator at a Jewel-Osco in Illinois, she used the Turing Shield each time she began her workday as part of a COVID-19 screening process. [1-1] ¶ 53. She also alleges that the Turing Shield scanned her facial geometry, which was subsequently stored in Turing's systems and databases, and was later disseminated to third parties such as Amazon Web Services, all of which occurred without her informed written consent. *Id.* ¶¶ 55–58, 63. Taking these facts as true (as required on a Rule 12(b)(6) motion to dismiss), Plaintiff sufficiently alleges that the conduct giving rise to her claims occurred primarily and substantially in Illinois.

In support of its argument to the contrary, Turing cites two cases— *Neals v. PAR Tech. Corp.*, 419 F. Supp.3d 1088 (N.D. Ill. 2019) and *McGoveran v. Amazon Web Services, Inc.*, No. 20-1399-LPS, 2021 WL 4502098 (D. Del. Sep. 30, 2021). *See* [28] at 19–20. In *Neals*, a plaintiff brought BIPA claims against the developer of a timekeeper system used by her employer that scanned employee fingerprints. The court in *Neals* held that Illinois' extraterritoriality doctrine barred her claim because plaintiff failed to allege in her complaint that she scanned her fingerprints into the

timekeeper system in Illinois and did not allege the location of her employer. 419 F. Supp. 3d at 1091. The court emphasized, however, that "if plaintiff were able to so allege, then she would sufficiently allege facts indicating that the circumstances relating to the alleged transaction occurred primarily and substantially in Illinois." *Id.* Next, *McGoveran*, involved Illinois plaintiffs who alleged that out-of-state defendants scanned their voices without notice or authorization. 2021 WL 4502098, at *4. There, the court also found that the extraterritorial doctrine barred the claims but only because it found "no indication that Defendants did anything in Illinois" and the only nexus to Illinois was plaintiff's residency. *Id.* Overall, both these cases remain distinguishable because the plaintiffs there, unlike the Plaintiff here, failed to allege any facts to plausibly infer that the conduct underlying their BIPA claims occurred in Illinois. Should additional facts come to light during discovery that indicate that the conduct giving rise to Plaintiff's claims did not occur primarily or substantially in Illinois, Turing may move to invoke this doctrine again in an appropriate motion. *Rivera*, 238 F. Supp. 3d at 1102 (applying the extraterritoriality doctrine is fact-intensive and better resolved after discovery at the summary judgment phase of litigation); *Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 538 (7th Cir. 2011) (same); *Vance v. Amazon.com Inc.*, 525 F. Supp. 3d 1301, 1308–09 (W.D. Wash. 2021) (same). But at the pleading stage, the Court declines to dismiss Plaintiff's complaint under the Illinois extraterritoriality doctrine.

### b. PREP Act Immunity

Next, Turing claims immunity from liability under the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. § 247d-6d *et seq.* [28] at 22. The PREP Act provides immunity from liability under federal and state law "caused by, arising out of, relating to, or resulting from" the "use of a covered countermeasure" upon the declaration of a public health emergency by the Secretary of the Department of Health and Human Services ("HHS"). 42 U.S.C. §§ 247d-6d(a)(1), (a)(2)(B). The scope of the immunity is broad as it "applies to *any* claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the . . . administration . . . or use of such countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B) (emphasis added). Claims of loss covered by the PREP Act's immunity provision include "physical, mental, or emotional injury" as well as the "fear" of any such injuries. 42 U.S.C. § 247d-6d(a)(2).

The PREP Act defines a "covered countermeasure" as either a "qualified pandemic or epidemic product," a "security countermeasure," a drug, biological product, or device authorized for emergency use under sections 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act ("FDCA"), or a "respiratory protective device" approved by the National Institute for Occupational Safety and prioritized by the Secretary of HHS for use during the public health emergency. 42 U.S.C. § 247d-6d(i)(1). Relevant here, a "qualified pandemic or epidemic product" under the PREP Act is a device that is approved or cleared under the FDCA, subject to an exemption

under sections 505(i) or 505(g) of the FDCA, or authorized for emergency use under sections 564, 564A, or 564B of the FDCA.  42 U.S.C. § 247d-6d(i)(7)(B).

Immunity for a particular countermeasure only applies, however, if the Secretary's declaration "has been issued with respect to such countermeasure."  42 U.S.C. § 247d-6d(a)(1).  The declaration by the Secretary of HHS must identify, among other things, the current or impending public health emergency and the covered countermeasures and class of individuals entitled to immunity under the PREP Act.  42 U.S.C. § 247d-6d(a)(2)(B).  On March 10, 2020, the Secretary of HHS declared a public health emergency due to the COVID-19 pandemic, effective February 4, 2020, and extended immunity to covered countermeasures as they are defined under the PREP Act.  *See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198, 15,198 (Mar. 17, 2020) (the "Declaration") ("Covered countermeasures must be 'qualified pandemic or epidemic products,' or 'security countermeasures,' or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the [FDCA], and the Public Health Service Act.").[4]

---

[4] The Declaration has since been amended ten times, but the amendments continued to clarify that covered countermeasures under the Declaration extend to covered countermeasures as defined under the PREP Act.  *See* Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 21012 (Apr. 15, 2020); Second Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 35100 (June 8, 2020); Third Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 52136 (Aug. 24, 2020); Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration, 85 Fed. Reg. 79190 (Dec. 9, 2020); Fifth Amendment to Declaration Under the Public Readiness and Emergency Preparedness

Turing does not dispute that the Turing Shield is not approved, cleared, or authorized under the FDCA.  *See* [28] at 25; [43] at 23.  But in Turing's views, the Turing Shield has "*de facto* clearance" as a "qualified pandemic or epidemic product" under the PREP Act because the Turing Shield complies with the recommendations of an April 2020 enforcement policy issued by the Food and Drug Administration ("FDA"), the agency charged with enforcing the FDCA.  *See* [43] at 24; 21 U.S.C. § 393(a); U.S. Department of Health and Human Services, *Enforcement Policy for Telethermographic Systems During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency: Guidance for Industry and Food and Drug Administration Staff (April 2020)*, https://www.fda.gov/media/137079/download (last visited Aug. 17, 2022) ("Enforcement Policy").[5]  Not so.

Indeed, Turing's argument relies on a flawed reading of the Enforcement Policy.  In the Enforcement Policy, the FDA declares that FDCA requirements govern devices that determine surface skin temperature ("telethermographic systems") if

Act for Medical Countermeasures Against COVID-19, 86 Fed. Reg. 7872 (Feb. 2, 2021); Sixth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 86 Fed. Reg. 9516 (Feb. 16, 2021); Seventh Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 86 Fed. Reg. 14462 (Mar. 16, 2021); Eighth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 86 Fed. Reg. 41977 (Aug. 4, 2021); Ninth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 86 Fed. Reg. 51160 (Sept. 14, 2021); Tenth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 87 Fed. Reg. 982 (Jan. 7, 2022).

[5] The Court considers the Enforcement Policy and the Secretary of HHS's Declaration and its subsequent amendments on a 12(b)(6) motion because these are matters of public record and Plaintiff does not object to the Court's consideration of these documents.  *See, e.g., Parungao v. Cmty. Health Sys.*, 858 F.3d 452, 457 (7th Cir. 2017) (noting a district court may "take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned.").

27

they are intended to be used for a medical purpose but in an effort to expand these systems' availability during the COVID-19 public health emergency, the FDA intends to "not object" to their use for medical purposes provided they comply with the Enforcement Policy's recommendations, such as adding labels on the systems that help users understand the device and caution the device is not FDA-cleared or approved. Enforcement Policy at 4. Yet, even if the Turing Shield might meet the FDA's recommendations outlined in the Enforcement Policy (which the Court cannot determine based solely on the pleadings), the Enforcement Policy does not give telethermographic systems "*de facto*" clearance in accordance with the FDCA's complex statutory and regulatory scheme. *See, e.g.*, 21 U.S.C. § 360c *et seq.*; *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) (discussing the premarket approval process for devices under the FDCA, which the court describes as a "rigorous process," and the approval process for devices under Section 510(k) of the FDCA). To the contrary, the Enforcement Policy states the general rule that telethermographic systems intended for medical purposes must receive approval from the FDA under the FDCA. *See* Enforcement Policy at 7 ("In general, manufacturers of telethermographic systems intended for adjunctive diagnostic screening are required to submit premarket notification pursuant to section 510(k) of the FD&C Act (21 U.S.C. 360(k)) and 21 CFR 807.81 to FDA and receive FDA clearance prior to marketing these devices in the United States, as well as comply with postmarketing requirements."). Furthermore, the Policy states that the FDA will "not object" to the use of telethermographic systems for medical purposes for the duration of the COVID-19

public health emergency if, among other things, manufacturers include labels cautioning that the devices are *not* FDA-cleared or approved.[6]

In short, the PREP Act's definition of "covered countermeasures" is clear and unambiguous. It provides immunity only for "claims for loss" that "arise or relate to" the use of a covered countermeasure. Because there is nothing in the record to indicate that the Turing Shield meets the requirements of the PREP Act's definition of a "covered countermeasure," the PREP Act's immunity provisions do not apply to Plaintiff's BIPA claims. Accordingly, the Court denies Turing's motion to dismiss on this basis.[7]

### c. Sufficiency of Plaintiff's BIPA Claims

Finally, Turing argues that the Complaint fails to allege that Turing collected, captured or possessed any "biometric identifiers" or "biometric information" as defined under BIPA. [28] at 21. Turing insists that the data it collected from Plaintiff's face does not qualify as a "scan of facial geometry" under BIPA because a

---

[6] Moreover, even if the Enforcement Policy constituted a "*de facto*" FDA clearance, the non-binding nature of the Enforcement Policy means it is not entitled to deference under *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Enforcement Policy plainly states that "[t]his guidance represents the current thinking of the Food and Drug Administration [] on this topic. It does not establish any rights for any person and is not binding on FDA or the public." Enforcement Policy at 1; *see also* 21 C.F.R. § 10.115(d)(1) ("Guidance documents do not establish legally enforceable rights or responsibilities."). As the Seventh Circuit has noted, the court remains "extraordinarily reluctant to follow unofficial interpretations which the agency itself does not view as binding." *Echevarria v. Chi. Title & Trust Co.*, 256 F.3d 623, 629 (7th Cir. 2001); *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").

[7] Plaintiff also argues that her injuries have no causal connection to her use of the Turing Shield as an alleged "countermeasure" because her claims involve Turing's failure to provide her with required disclosures and obtain her written consent prior to collecting her biometric information, [37] at 24. The Court need not address this argument given its finding that the Turing Shield does not qualify as a covered countermeasure under the PREP Act.

scan of a face geometry only encompasses "a 'scan' by 'facial recognition software' that 'extracts a highly detailed map or template for each face based on its unique points and contours.'"  [28] at 15 (quoting *Monroy*, 2017 WL 4099846, at *1).  Here, Turing relies upon a definition of "scan of face geometry" that does not come from BIPA itself but rather from another court's recitation of what the plaintiff in another BIPA case alleged the defendant's technology did.  *See Monroy*, 2017 WL 4099846, at *1 ("Shutterfly's facial recognition software scans the image, locates each of the faces in the image, and extracts a highly detailed 'map' or 'template' for each face based on its unique points and contours.").  BIPA's operative legal text, however, defines "biometric identifier" as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry" and defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual."  740 ILCS 14/10.  Thus, the real issue here is whether Plaintiff has alleged sufficient facts to allow for a plausible inference that the Turing Shield collected Plaintiff's "biometric identifier" or stored her "biometric information" as those terms are defined under the plain language of BIPA.

The Court concludes that she has done so.  In her complaint, Plaintiff alleges that the Turing Shield utilizes an "artificial intelligence algorithm" to detect a user's forehead in order to take the user's temperature and also uses "facial recognition software" to detect whether the user is wearing a face mask.  [1-1] ¶ 5.  In addition to temperature screenings and face mask detection, the Turing Shield also allegedly "recognizes the user" by using its camera to "collect[] the user's facial geometry" and

analyzes the data through the use of an algorithm, *id.*, and then stores the data collected from the screening in Turing's database(s), which can identify up to 20 million faces. *Id.* ¶ 6. These allegations allow for a plausible inference that the Turing Shield's temperature screening, face mask detection, and facial recognition functions require a scan of Plaintiff's face, which amounts to a "scan of . . . face geometry" within BIPA's definitions of biometric identifier and biometric information. Plaintiff also alleges that Turing collected and disseminated this data to third parties without providing her with the disclosures required by BIPA or receiving her written consent. *Id.* ¶¶ 57–58, 63. Thus, Plaintiff also alleges a plausible claim against Turing for violations of Section 15(b) and (d) of BIPA. *See* 740 ILCS 14/15(b), (d).

Finally, Turing's last argument—that Plaintiff failed to allege how the Turing Shield identifies employees based on the temperature screening or face mask detection function—cannot be resolved on a Rule 12(b)(6) motion to dismiss. [28] at 22; [41] at 18. At the pleading stage, a plaintiff need not allege "detailed factual allegations," but must allege "enough factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570)). As discussed above, Plaintiff has alleged that the Turing Shield's "artificial intelligence algorithms" analyze a user's face scan to not only screen a user's temperature and detect for face masks, but also recognize a user against a database that can store up to 20 million faces. [1-1] at ¶¶ 5, 6. Further discovery

31

may shed light on exactly how the Turing Shield does this but, at the pleading stage, Plaintiff's allegations suffice to survive a Rule 12(b)(6) motion to dismiss.

## IV. Conclusion

For the reasons explained above, the Court denies Defendant's motion to dismiss [27]. The Defendant shall file its answer to Plaintiffs' complaint on or before October 24, 2022.

Dated: September 26, 2022                    Entered:

John Robert Blakey
United States District Judge